[Crim. No. 3943. In Bank.—March 24, 1936.]

THE PEOPLE, Respondent, v. C. L. BYERS, Appellant.

Dempster McKee for Appellant.

Thomas Whelan, District Attorney, San Diego County, and John T. Holt, Deputy District Attorney, for Respondent.

THE COURT.—A hearing was granted in this case to give further consideration to certain contentions made by appellant. After reading the entire record, we are satisfied that the District Court of Appeal, Fourth Appellate District, has properly analyzed the evidence and has properly disposed of appellant's contentions. We, therefore, adopt as a portion of the

opinion of this court the following portions of the opinion of the appellate court, which opinion was prepared by Mr. Presiding Justice Barnard and concurred in by Justices Marks and Jennings:

"The defendant, who is city attorney of the city of San Diego, was charged under sections 758 to 771, inclusive, of the Penal Code, with wilful and corrupt misconduct in office and after trial by a jury was convicted on eight counts of the charge. These counts relate to various charges of misappropriating city funds drawn by him for the purpose of paying expenses of trips taken on official business connected with his office as city attorney, and making false reports as to his expenditure of such moneys. From a judgment removing him from the office of city attorney of said city the defendant has appealed.

"The purchasing department of the city of San Diego maintained a revolving fund from which the appellant had been in the habit of drawing expense money for trips up to the amount of $25, and later filing accounts with the purchasing agent showing the disposition of moneys thus advanced. On August 11, 1933, he signed and presented to the city auditor a claim for $25 setting forth that it was for the expenses of himself, the city treasurer and two police officers on a trip to Los Angeles on August 12, 'to obtain R. F. C. cash'. The claim was sworn to in the usual manner, reciting that it was correct and legal, that the items contained therein were furnished to the city and that the amount was due. A warrant for that amount was issued to him, which he cashed that day at the city treasurer's office. The next day the appellant, the city treasurer and two police officers went to Los Angeles in a police car belonging to the city of San Diego for the purpose of delivering certain bonds to a federal reserve bank in furtherance of city business. That night the appellant and the city treasurer stayed at the Alexandria Hotel. It appears that the appellant did not buy any gasoline or oil on the trip to Los Angeles, that he did not pay the hotel bill for himself or the city treasurer, that he did not pay for certain meals eaten by the treasurer and the two officers in the course of the trip, and that he did not give any moneys to the city treasurer or to the two officers for the purpose of paying any expense incurred by them. [He did, however, pay for a luncheon for the party, amounting to $2 or $3, and paid his

fare back to San Diego, amounting to but several dollars.] He did not inform any of the other parties that he had city funds with which to pay the expenses of the trip and the city treasurer testified that when they left the hotel the appellant told him that it would be convenient for him if the treasurer would pay the bill. The treasurer paid the bill for both of them and was not reimbursed by the appellant. After returning to San Diego the treasurer put in a claim to the city and was paid the sum of $17 to reimburse him for the expenses thus paid by them. No return or accounting was ever made by the appellant as to what was done with the $25 advanced for the expenses of this trip.

"On October 30, 1933, an ordinance was passed by the council of San Diego appropriating $2,500 from the El Capitan dam bond fund for the purpose of providing funds to pay certain costs in connection with the application of the city to the United States for a grant to complete the El Capitan dam project, it being provided that its purpose was only and exclusively to provide funds to pay legal, engineering and sustenance expenses of the city and its attorney. On November 6 and November 8, 1933, upon sworn claims, the appellant received and cashed two warrants, receiving a total of $1,600 from the funds so appropriated. On November 17, 22, 23 and 24, 1933, the appellant signed certain checks and slips at the Alexandria Hotel in Los Angeles. His hotel bill at the hotel on that trip was $116.28 and he left the hotel on November 25, 1933, without paying any part thereof. [The largest portion of this bill was for personal expenses, but in the account later filed by appellant he charged against the city certain amounts for room and meals for the above days.] He returned to Los Angeles on December 1, 1933, going to a different hotel. While he was in Los Angeles most of December, 1933, and part of January, 1934, he did not communicate with the Alexandria Hotel or pay that bill. Many statements sent to him during 1933 and 1934 by that hotel were not answered. On September 4, 1934, he answered one of their letters, stating that he did not know who was entitled to receive the money. The bill was placed in the hands of an attorney and the appellant informed this attorney that the bill was due and should have been paid a long time ago, but that he had been hard-pressed financially and would take care of it on October 5, 1934. He paid $50 on the account on or about October 1, 1934, and

later an action was brought, judgment by default was entered, and the balance was finally obtained by levying execution against his salary. In the meantime, on May 3, 1934, the appellant filed an accounting with the city auditor as to the $1,600 received by him, setting forth various expenses incurred, including the charges of the Alexandria Hotel on November 17, 22, 23, 24, 1933, and returning the balance of the amount received.

"In this account filed on May 3, 1934, the appellant included as expenses certain items for meals and hotel on December 20 and 21, 1933, totaling $24.40 and other items for hotels, meals and telephone on December 28 and 29, 1933, to the amount of $17.15. It appears from the evidence that bills for these amounts were incurred by him on those dates at the Biltmore Hotel in Los Angeles, that he left that hotel on December 31, 1933, without paying any of said charges, that a number of letters written to him by the hotel were not answered and that the bill was not paid until August 14, 1934, some months after the accounting was filed with the city.

"On November 28, 1933, the appellant received $22 from the purchasing agent of San Diego to cover the expense of a trip to Los Angeles. On December 11, 1933, he received $4.56 from this department purportedly covering the balance of his expenses on that trip. An itemized account covering these expenses was filed on December 11, 1933. In his accounting for the $1,600 received, which he filed on May 3, 1934, the appellant again included and received credit for the same items, exact in date and amount, which had been turned in to the purchasing department in his accounting of December 11, 1933, the duplication amounting to $26.56.

"On January 28, 1935, the appellant appeared before the grand jury of San Diego county, at its request, and gave certain testimony. In the beginning he stated that he was willing to and would answer any questions relating to the conduct of his office in connection with city affairs, but that he refused to answer any questions relating to his personal affairs on the constitutional ground that to answer such questions might tend to degrade or incriminate him. He testified that he had known that he was to be called before the grand jury to be questioned with regard to his expense accounts and that, at his request, his chief deputy had made an examination of his accounts and compared his records with those of other city

officers. He admitted that there was a duplication in the accounts as to the $26.56, which he said he could not explain, and also admitted that he had never filed an account for the $25 received by him on or about August 11, 1933. He also stated that on that morning, before coming before the grand jury, he had repaid to the city the sum of $25 and $26.56, paying the same out of his personal moneys. While he refused to answer many questions on the constitutional ground referred to, an inference may fairly be drawn from his statements to the grand jury that he was without funds during at least a part of the time material here if, in fact, there is not a direct admission to this effect. At the trial of the action the appellant did not take the stand.

■ ''The first point raised is that it was no part of the official duties of the appellant, as city attorney, to possess or disburse any city funds, that any possession of city funds on his part was necessarily outside the scope of his official duties and, therefore, that anything he might do with relation to city moneys which were actually in his possession could not constitute misconduct in office. Cases are cited on the proposition that the conduct of an officer which is outside the scope of his official duties, even though criminal in nature, will not constitute misconduct in office and many cases are cited from this and other jurisdictions in actions on official bonds where it has been held that the particular act in question is not within the contemplation of the bondsmen in assuming liability for the official acts of the officer. It is argued that in no case has it been held that misappropriation of money by an officer is within the line of his official duties unless under a strict interpretation of the law he was authorized to receive the money, and that no such authorization here appears. Some very technical rules have been applied in some such cases in favor of bondsmen on official bonds. While some jurisdictions have followed the rule that the surety in such a case is liable only for the acts of his principal *virtute officii*, the rule in this state seems to be established that such a surety is liable for the acts of his principal *colore officii*. (*Abbott* v. *Cooper*, 218 Cal. 425 [23 Pac. (2d) 1027].) It should also be kept in mind that the problem here is somewhat different from that presented in the line of cases referred to, where the rights of third party sureties were involved.

"The appellant insists that the city charter of San Diego makes no provision for any funds coming into the hands of the city attorney. While this is true, the charter does not affirmatively provide that no money shall come into the hands of the city attorney, and it does authorize and direct that officer to handle the legal work of the city. There can be no question that the work upon which the appellant was engaged at the times here in question was well within the line of his official duties. If in carrying out such duties city funds came into his hands in connection therewith and as a part thereof, we should hesitate to hold that such money was not received and held by him under color of his office or that any failure to properly account for the same would not constitute misconduct of his office. . . . ▮ [In this special proceeding, the accused is not entitled to the same defenses available to a bondsman under a definite contract.] The only punishment provided is removal from office. A high standard should be and is required of public officers in the conduct of their duties and many things may constitute misconduct in office which might not be sufficient to meet more severe requirements in other matters. There can be no question that the appellant received this money because he was city attorney and for the direct purpose of enabling him to perform certain services for the city as such officer. Whether or not other officers of the city had authority to advance expense money to him the trips were a part of the appellant's official duty and having funds in his possession which he knew to be city funds and which he had obtained through his official position and solely for the purpose of paying the expenses of such trips, it became his duty to account for them and a failure to do so is none the less misconduct in office if, in fact, other officers of the city are not free from blame. . . .

▮ "The appellant's second point is thus stated by him: 'In admitting over objection evidence that the accused refused to answer certain questions propounded to him by a deputy district attorney at a meeting of the grand jury, on the ground that to answer might tend to degrade and incriminate him, the court permitted reversible error.' It is argued that the admission of such evidence was error in that it compelled the appellant to be a witness against himself and deprived him of his constitutional privilege not to answer questions. While it seems to be conceded that the statements which were made

by the appellant to the grand jury were voluntarily made it is argued that the particular portions objected to, that is the refusal to answer certain questions on the ground named, could not be considered as voluntary statements and were not admissible.

''While the introduction into evidence in a criminal case of testimony given by a defendant before a grand jury has been often questioned and under some circumstances held to be error, other cases indicate it may be admitted as an admission when voluntarily given at a time when no formal charge is pending and when a defendant is represented by counsel or otherwise is cognizant of his rights. (*People* v. *Young,* 31 Cal. 563, 564; *People* v. *Sexton,* 132 Cal. 37 [64 Pac. 107]; *People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) If such evidence is ever admissible it should be in such a case as this which, while criminal in nature, is a special proceeding designed to protect the government itself by securing faithful performance of their duties by its officers and servants and this is especially true where, as here, the person accused is an able lawyer fully cognizant of his legal rights, who has voluntarily appeared and made such statements as he considered favorable to himself.

''When the transcript of the appellant's testimony before the grand jury was offered in evidence his counsel started to object without stating the grounds of his objection and then suggested that the prosecuting attorney 'offer the questions and answers'. The court suggested that the testimony be read to the jury instead of giving them the transcript and that the appellant's counsel interpose such objections as he had. Thereupon the statements made by the appellant to the grand jury were read to the jury and no objection was made except at those points where questions were asked and where the appellant refused to answer on the ground that the answer might tend to degrade or incriminate him. Such refusal to answer occurred some twenty-three times in the transcript of this testimony and in each instance, as the reader came to that point, an objection was made to that particular part only. These objections were all overruled. The appellant did not take the stand at the trial. . . . ▮ Under such circumstances, where the appellant, with full knowledge as to his legal rights, voluntarily undertook to make certain statements to the grand jury . . . , we think it was not prejudicial

error to admit the entire record and that the appellant was not entitled to claim immunity as to parts thereof while acquiescing in the admission of other portions more favorable to himself. This is particularly true in an action of this nature, involving the good faith of a public official in the performance of his duties, and we think that such an official should not under such circumstances be allowed, without taking the stand, to secure the benefit of such parts of a voluntary statement as he considered favorable and to object to other portions thereof in which he refused to explain matters suggested by his own statements and which obviously called for an explanation.

"The appellant argues that the only purpose in reading his testimony before the grand jury was to prejudice him by getting before the jury the fact that he had declined to answer certain questions. The transcript thus read to the jury contains statements made by the appellant which were material to the matter in issue. Among other things the appellant stated to the grand jury that he would try to answer all questions relating to city affairs having to do with his official position; that he drew $25 on or about August 11, 1933, for a trip to Los Angeles on August 12; that he presumed one of the police officers paid for the gasoline used on the trip to Los Angeles; that he could not remember whether he had paid for any meals; that he could not remember who paid the hotel bill; that the city treasurer paid the hotel bill on one trip, but he did not remember which one; that he did not repay the treasurer this amount; that either on this trip or another trip the city treasurer paid for some meals; that on this particular trip he did not pay any of the expenses of the treasurer or the two officers; that he presumed he had paid his own way back but could not remember; that he had the $25 with him while on the trip; that he could not remember why he did not pay his or the treasurer's hotel bill; that he could not recall whether or not he was in financial difficulties at that time but that he did not have any bank account; that he drew the $25 in advance for the purpose of having funds for that trip; that it is possible that there may have been times since that day when he had no money and had to borrow some; that he repaid the $25 to the city that morning before coming before the grand jury because he had discovered it had never been accounted for; that he had contemplated being before the

grand jury for a number of days; that he turned in another $26.56 that morning; that there was a duplication as to this which he could not explain; that he repaid these amounts out of his personal money; that when he drew $26.56 in November, 1933, and put in an account for that amount for expenses of November 30, December 1 and December 2, 1933, he had the $1,600 in his pocket which he had drawn for expenses for that sort of trip; that he was unable to explain this; and that when he made his accounting in May, 1934, he knew he had not paid the hotel bills in Los Angeles. He refused to answer a question as to where the $1,600 was at the time he drew additional $26.56, refused to answer a question as to whether he had not used the greater part of the $1,600 for personal affairs at that time, refused to answer a question as to whether he did not have to borrow money at one time to make up a part of the $1,600 in order to make a trip; and when asked if he had used any part of the $1,600 for any of his personal affairs, he replied: 'The money was received lawfully and in my possession, the expenses were paid and the balance turned into the city and every penny of the balance turned into the city and every penny of the $1,600 accounted for. Beyond that, I will refuse to answer.'

■ ''Under the circumstances of this case we are unable to hold that the admission of evidence of appellant's refusal to answer certain questions before the grand jury was reversible error. Under the recent amendment to the Constitution (art. I, sec. 13), even in a criminal case, the refusal of a defendant to explain evidence against him may be considered by the jury. The jury had the right to consider the fact that the appellant did not take the stand or explain the evidence against him, and it is difficult to see how the fact that he had previously refused to explain could be much more prejudicial.

''It is finally urged that the evidence is insufficient to sustain the verdict and judgment. In this connection it is argued that, at best, the evidence merely shows that certain expenses incurred were not paid, but fails to show what was actually done with the money; that although the money drawn was not used for particular expenses shown, it may have been otherwise spent for the benefit of the city; that while certain hotel bills were not paid the appellant may, at the same time, have had rooms in other hotels paying for the same with the city money; that in any event he may have had the money at all

times available and ready to return; that no demand was made upon him for the return of the money; and that any actual shortages were later paid.

"The repayment of certain moneys many months later is not in itself a sufficient answer to such a charge even though such payments preceded a demand therefor. The jury was not required to draw the other inferences suggested, and the evidence, a portion of which has been herein summarized, is the best answer to the rest of these contentions. In our opinion, the evidence discloses a situation inconsistent with proper conduct in such an office and entirely sufficient to constitute misconduct therein within the meaning of the statutes. In the absence of any adequate explanation we think the evidence, including the statements and admissions of the appellant which were admitted without objection, is, with the inferences which the jury might reasonably draw therefrom, amply sufficient to sustain the verdict and judgment."

The amounts involved in the charges above referred to are small. As to most of the items involved in these charges, the jury might well have found that they were the result of mistake or carelessness. If appellant had seen fit to make a complete and fair disclosure of the facts, either to the grand jury or to the trial jury, and if the truth is that the apparent misappropriations were the result of mistake or carelessness, he could undoubtedly have convinced the two juries of that fact. However, appellant saw fit, as he had a right to do, to refuse to testify at all at his trial, and refused, as he had a right to do, to answer many questions asked him after he had voluntarily appeared before the grand jury. The People, as the above summary of the evidence indicates, proved a *prima facie* case of misappropriation of public funds. This *prima facie* case was not rebutted by appellant. Under such circumstances, this court must affirm the judgment.

One of the main points urged by appellant on this petition is that it was error to admit into evidence at his trial all of appellant's testimony before the grand jury, including his refusal to answer certain questions on the ground that his answers might tend to incriminate him, and to permit the district attorney to comment on this refusal in his argument to the jury. That all of appellant's statements made before the grand jury were admissible seems clear. (*People* v. *Sexton*, 132 Cal. 37 [64 Pac. 107] ; *People* v. *West*, 3 Cal. App. (2d)

568 [40 Pac. (2d) 278].) Having voluntarily gone before the grand jury and given certain testimony, most of which was favorable to himself, and having refused to explain before the grand jury certain incriminating facts, we think that, under the new constitutional amendment above referred to, the district attorney was entitled to comment on that fact. Having elected voluntarily to appear before the grand jury as a witness, he necessarily assumed the responsibilities incident to that position.

The judgment and order appealed from are affirmed.