[Crim. No. 6111.   In Bank.   Mar. 27, 1958.]

THE PEOPLE, Respondent, v. BERNARD P. CALHOUN, Appellant.

John W. Preston, John W. Preston, Jr., William P. Mahedy and Charles H. Carr for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), and Jack R. Levitt, Deputy District Attorney, for Respondent.

McCOMB, J.—Defendant, with William G. Bonelli and certain John Does, was charged in an indictment with con-

spiring to violate section 5002.5 of the Elections Code.[1] The indictment alleged that the persons so charged, together with 10 unindicted coconspirators, conspired to commit the crimes of soliciting, asking and receiving political contributions from persons licensed to sell liquor by the Board of Equalization, such contributions being for use in campaigns for the reelection of Bonelli as a member of that board.

In the second and third counts they were charged with conspiring to commit acts injurious to public morals, to pervert and obstruct justice, and to prepare false papers and records for fraudulent purposes for use in proceedings and inquiries authorized by law, in violation of section 182, subdivision 5, of the Penal Code.[2]

Mr. Bonelli was not available for the trial, and it proceeded as to defendant Calhoun alone. After trial before a jury, he was found guilty on all three counts. He appeals from the judgment and the order denying his motion for a new trial.

The evidence, viewed in the light most favorable to the People, discloses a plan which was followed in various counties in soliciting, receiving and using campaign contributions from liquor licensees in connection with the 1950 and 1954 campaigns of Bonelli for reelection to the Board of Equalization. Checks for contributions from retail liquor licensees were made payable to the National Democratic Club, the Aldine Printing Company, the Woolever Press, and a fictitious company known as the Allied Printing Company. Defendant was general counsel and "Public Relations Man" for the Southern California Spirits Foundation, an association composed of wholesale liquor distributors whose members paid regular dues which were supposed to be used for certain purposes only.

Another fund existed known as the "Research and Public

---

[1] Section 5002.5 of the Elections Code reads: "Any elective State officer who is authorized by law to issue licenses, or who is a member of any board or agency authorized to issue licenses, or any person seeking election to such office, board or agency, or any appointee or employee of such office, board or agency, who directly or indirectly solicits, receives or agrees to receive any money or other thing of value, or any promise thereof, from any licensee named in, or any holder of, any license issued by such officer, board or agency, or from any agent of such licensee or license holder, for any political campaign of any person seeking election or reelection to the office, board or agency authorized to issue such license, is guilty of a misdemeanor."

[2] Section 182 of the Penal Code reads in part: "If two or more persons conspire: . . . 5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws . . . they are punishable as follows: . . ."

Relations Fund," to which the Spirits Foundation was the largest contributor, but which contained other contributions arranged for by defendant. As a practical matter, defendant exercised control over the expenditure of the money in this fund. On his instructions large amounts were drawn on this fund by checks payable to cash, and other checks were drawn in payment of bills presented by the above-named printing companies and an advertising company for expenses in connection with the Bonelli campaign.

These funds and checks were manipulated in various ways. For instance, the evidence indicated that a check payable to defendant, as trustee, was used to replace several small checks made payable to Aldine and signed by retail liquor licensees.

At the trial 59 witnesses testified for the prosecution and 17 for defendant. The reporter's transcript contains 2,498 pages, including 370 pages of testimony by defendant.

The record discloses that defendant spent many thousands of dollars from funds of the Spirits Foundation and Research Fund without direct authorization for the particular expenditures, the checks being made to the same printers and advertisers as were the checks of the retail licensees. None of them showed on their face that they were for Bonelli's campaign, and the way many checks were issued, receipts handled, and entries made on the records may have been designed to conceal that fact.

Defendant ordered a large amount of the printing for Bonelli's campaign, conferred with Bonelli and with the printers, and cashed certain checks and had others issued in their place before paying some of these bills.

In many instances individuals and firms were told to send checks to these printing companies, and later received invoices for printing which they had never ordered or received. Several witnesses testified that they were told to do this by defendant.

Defendant told one Casteel, who offered to make a contribution to Bonelli's 1954 campaign, to make the check payable to the National Democratic Club. When Casteel objected, defendant told him to make it to the Aldine Printing Company and said, "We will see that you get a bill for printing or something of that sort and that will take care of it." Defendant admitted telling Casteel how to make a contribution on Bonelli's behalf.

One member of the Spirits Foundation testified that he asked defendant at several meetings where the funds of the

Foundation were being spent and was told by several people, and possibly by defendant, that he had "probably better not know."

There is a great deal of evidence that checks from liquor licensees, for contributions solicited on Bonelli's behalf, were payable to these printing firms, which were doing large amounts of printing for the Bonelli campaigns, and that defendant played an important part in connection with the solicitation, receipt, and disbursement of these funds which were used for the purpose of securing the reelection of Bonelli.

Defendant was charged not only with soliciting but with receiving such contributions, and the evidence shows that, aside from the dues paid into the Spirits Foundation, he received political contributions from six other concerns and individuals which were used for the benefit of the Bonelli campaigns.

While defendant insisted that he had used the dues paid by the members of the Spirits Foundation strictly in accordance with their authorization and desires, several of them testified that they did not know how he was using this money and that they would not have approved of the way it was in fact used.

Defendant testified that in 1954 he spent more time with Bonelli than in any prior campaign, primarily because of Proposition Number 3; that ". . . it is almost impossible to segregate the two campaigns"; that "The bills that I paid were bills he [Bonelli] always gave to me and asked if I could take care of. That was the net result. I paid those bills directly to the parties who had sent in the bills and paid them by check"; and that "I think all of the payments that went for Bonelli's bills came out of the Research and Public Relations Fund." When asked why he had used this money in the Bonelli campaigns, he replied that he did it because the members of the association had to keep Bonelli on their side; and that "They had to conduct their business under Mr. Bonelli's direction and the liquor business is very highly regulated and suspensions can be had very easily for violations, intentional or otherwise, many times unintentional."

Although not separately so stated or argued, defendant's basic contentions are that he was the mere agent of the Spirits Foundation and his acts and conduct in receiving and handling funds and paying bills in connection with Bonelli's campaigns were solely those of such an agent; that these funds came from regular dues paid by the members and

were in no way solicited; and that if any conspiracy existed, the evidence is not sufficient to connect him with the acts and conduct of Bonelli and other actors in any such conspiracy.

## DEFENDANT'S CONTENTIONS

*First*: That the trial court erred in telling the jury that although Bonelli was not present at the trial, the jury would have to try each and all acts committed by Bonelli as though he were present and being tried.

This contention is untenable. It is argued that the court implied that if Bonelli was guilty of conspiring with any of the named but unindicted alleged coconspirators, then defendant would also be guilty; that Bonelli could be guilty and defendant innocent of the crime charged, and it was reversible error "to indissolubly connect them together"; and that there was no evidence reasonably tending to show that there was a conspiracy between Bonelli and defendant.

The judge told the jury, in effect, that there would be no change in the testimony because of the absence of Mr. Bonelli; that the case would have to be tried on the same basis as if Bonelli were present and represented by counsel; and that ". . . you have to try each and every act that he committed, *if there was a conspiracy here,* try each and every act within the conspiracy, *if one existed,* as though he were sitting down there." (Italics added.)

This was a correct statement. Where the existence of a conspiracy is established, evidence of the acts and declarations of the conspirators in furtherance of the conspiracy is admissible, and the judge in no way intimated that a conspiracy did exist or that any act was done within the scope of any conspiracy.

In a prosecution for conspiracy it is not essential to the conviction of a coconspirator that any or all other coconspirators shall be tried and convicted. (*People* v. *Gilbert,* 26 Cal.App.2d 1, 26 [78 P.2d 770].) Where the conspirators are not jointly tried, the admissibility of evidence as to the conspiracy may well be the same, as a coconspirator is liable for the acts of the other conspirators done in furtherance of the conspiracy.

*Second*: That the court erred in admitting in evidence hundreds of pages of testimony relating to matters occurring before the formation of the alleged conspiracy, in the absence of any evidence that a conspiracy existed or that defendant was a member thereof if one existed.

This contention is unsound. It is urged by defendant that the court admitted the testimony of the first 20 witnesses without any showing that a conspiracy existed or that defendant was a member thereof and that "the great bulk of the testimony of the other 39 witnesses for the State also failed to show that a conspiracy existed between Bonelli and defendant to solicit, ask and receive campaign contributions for Bonelli from liquor licensees of the Board of Equalization."

The record does not bear out the contention that 20 witnesses were allowed to testify before any evidence was introduced to establish the existence of a conspiracy.

The testimony of the first witness, Al Tossas, was directed to the conspiracy charged in the first count. The testimony of the second witness, Mary Forsythe, was directed to count two, and that of the third witness, Raymond McCullough, to count three.

It was not necessary to connect defendant with the conspiracy at the beginning of the evidence or before any other evidence of a conspiracy was received. As defendant concedes, the court had a reasonable discretion as to the order of proof, and there is nothing to indicate that this discretion was abused.

It is settled that a conspiracy may be established by direct evidence or circumstantial evidence, or a combination of both. It need not be shown that the parties entered into a definite agreement, but it is sufficient if they positively or tacitly come to a mutual understanding to accomplish the act and unlawful design. The evidence may cover many transactions, extend over a long period of time, and show acts which occurred some time before the alleged formation of the conspiracy, as long as the facts shown have some bearing or some tendency to prove the ultimate facts in issue.

Any competent evidence which tends to prove the existence of the conspiracy or any competent acts or declarations tending to show a common design is admissible. (*People v. Steccone*, 36 Cal.2d 234, 237 [2, 3] [223 P.2d 17]; *People v. Lyon*, 135 Cal.App.2d 558, 578 [5] [288 P.2d 57]; *People v. Chait*, 69 Cal.App.2d 503, 515 [10] [159 P.2d 445]; *People v. Malone*, 20 Cal.App.2d 1, 6 [3] [66 P.2d 216]; *People v. Stevens*, 78 Cal.App. 395, 407 [6] [248 P. 696].)

No particular evidence is pointed out in this connection as being inadmissible, and the contention that all of this evidence was inadmissible is without merit.

*Third*: That the court erred in admitting the testi-

mony of one Tomerlin concerning payment of (1) attorney's fees to defendant, and (2) $4,500 to Tomerlin's employee, Dennis Moore; and in admitting evidence that defendant paid $3,000 from the funds of the Spirits Foundation to Leonard Wilson as attorney's fees in defending Charles E. Berry in a prior action.

This evidence was properly admitted. It is argued with respect to the Tomerlin matters that this testimony was hearsay, that it is not shown to have any connection with the offenses charged in the indictment, and that there was no evidence of what Moore did with the money paid to him. This testimony was in connection with a contribution by the Wilton Hotel, that hotel being one of four to which defendant had promised assistance in obtaining a reduction or revocation of a license suspension. There was evidence that Tomerlin gave the money to Moore upon instructions from defendant in connection with an effort to have the suspension of the hotel's liquor license revoked and that no legal work was done or appearance made by defendant.

Defendant had told Tomerlin that someone would contact him for certain money which was to go to Bonelli, and the evidence was therefore material, although it did not directly show exactly where the money went.

Regarding the Berry matter, it is claimed that the testimony was not relevant to any issue in this case. This matter, while not very material, was one of a long list of things done by the various conspirators, and the evidence respecting it was not prejudicial.

*Fourth*: That the court erred in admitting "hundreds of pages of testimony concerning the deposits of cash and checks" by one Snyder in the bank account of the National Democratic Club and disbursements from said fund by Snyder; in admitting the testimony of Al Weigel and other witnesses concerning deposits in and checks drawn upon the Research and Public Relations Fund; and in admitting scores of checks, deposit slips, invoices and other documents without showing that defendant was connected therewith, and without first establishing prima facie that a conspiracy existed and that defendant was a member thereof.

This contention is unsound. All of this evidence was properly admitted under well-established rules governing the receipt of evidence for the purpose of establishing a conspiracy.

*Fifth*: That defendant was not given a fair and impartial

trial (1) because of certain statements made by the trial judge, and (2) because of alleged prejudicial misconduct by the district attorney.

Since the judgment must be reversed for the reasons set forth below and it is unlikely that the statements and conduct complained of will recur on a retrial, it is unnecessary to consider this contention.

■■■ *Sixth*: That the trial court committed prejudicial error in admitting, over objection, statements made by defendant before the 1954 San Diego Grand Jury in response to a grand jury subpoena.

This contention is sound. In his opening statement to the trial jury, the district attorney, referring to defendant's appearance before the grand jury and his refusal to answer questions, stated:

"You will also hear from the evidence that Mr. Calhoun testified before the San Diego County Grand Jury on December 22, 1954. At that time Mr. Calhoun invoked the Fifth Amendment privilege against self-incrimination 47 times and thereby refused to answer 47 questions that were put to him. Some of the questions were this:

" 'Question. Is it a fact that the Research and Public Relations Fund account paid approximately $31,000.00 in the year 1954 in the campaign, Bonelli's campaign?

" 'Answer. I am going to decline to answer that question on the grounds that the answer might tend to incriminate me.

" 'Question. Did you ever discuss campaign expenditures with Mr. Bonelli?

" 'Answer. I am going to decline to answer that question on the same grounds.

" 'Question. When was the last time you saw Mr. Bonelli?

" 'Answer. Well, I am going to decline to answer that question on the same grounds. I am going to decline to answer any questions in any way involving Mr. Bonelli.

" 'Question. Have you talked to Mr. Bonelli since you have been served with this subpoena?

" 'Answer. I think I will decline to answer that question on the same grounds, Mr. Sheela.

" 'Question. Has Mr. Bonelli ever asked you to pick up his printing bills or his outdoor advertising bills?

" 'Answer. I am going to refuse or decline to answer that question.' ''

Defendant's counsel then moved to strike the objectionable

matter as ''not proper in an opening statement,'' to which the trial judge said, ''Well, I think he has gone far enough.''

Thereafter during the trial, before the People had closed its case-in-chief and before defendant had taken the stand and testified, questions propounded to defendant before the grand jury and his responses thereto were, over his objection, read to the trial jury. In this way, evidence of defendant's refusal to answer 47 questions asked him by the district attorney when he was before the grand jury was put before the trial jury. To each question defendant had said, ''I am going to decline to answer that question on the grounds that the answer might tend to incriminate me.''

Defendant appeared before the grand jury in response to a subpoena. He was not there in the position of one who voluntarily appeared or one who appeared by mere request of the grand jury as in the cases of *People* v. *Lyon,* 135 Cal.App.2d 558 [288 P.2d 57] ; *People* v. *Byers,* 5 Cal.2d 676 [55 P.2d 1177] ; and *People* v. *Walsh,* 47 Cal.2d 36 [301 P.2d 247].

The People contend that the testimony was admissible because (1) it was an admission made by a party in response to an accusatory statement, and (2) defendant's reaction thereto showed a consciousness of guilt.

Neither of these grounds is tenable, for the reason that no implication of guilt can be drawn from a defendant's relying on the constitutional guarantee of the fifth amendment to the Constitution of the United States,[3] article I, section 13, of the Constitution of the State of California,[4] or Penal Code, sections 688,[5] 1323,[6] and 1323.5.[7] (*People* v. *Simmons,* 28 Cal.

---

[3]The fifth amendment to the United States Constitution reads in part: ''No person . . . shall be compelled in any criminal case to be a witness against himself.''

[4]Article I, section 13, of the California Constitution reads in part: ''No person . . . shall be compelled, in any criminal case, to be a witness against himself.''

[5]Section 688 of the Penal Code reads in part: ''No person can be compelled, in a criminal action, to be a witness against himself. . . .''

[6]Section 1323 of the Penal Code reads: ''A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. The failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by counsel.''

[7]Section 1323.5 of the Penal Code reads: ''In the trial of or examination upon all indictments, complaints, and other proceedings before any court, magistrate, grand jury, or other tribunal, against persons accused

2d 699, 720 [12] [172 P.2d 18]; *Grunewald* v. *United States,* 353 U.S. 391 [77 S.Ct. 963, 982 [21] et seq:, 1 L.Ed.2d 931]; *People* v. *Talle,* 111 Cal.App.2d 650, 663 [1] et seq. [245 P.2d 633].)

In view of the foregoing rule, the trial court prejudicially erred in holding that the grand jury testimony could be received in evidence as an admission and used to support a verdict. The use of evidence of the assertion of the privilege against self-incrimination as an indication of guilt and as support for a verdict is directly contrary to the intent of the constitutional provisions set forth above.

Such evidence does not fall within the scope of the 1934 amendment to article I, section 13, of the Constitution of the State of California, which provides that "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." Any inferences to the contrary in *People* v. *Byers,* 5 Cal.2d 676 [55 P.2d 1177], are overruled.

Provisions of the federal and state Constitutions and the Penal Code sections referred to above establish that: (1) No person can be compelled in a criminal action to be a witness against himself; (2) if he offers himself, he can be cross-examined by the People's counsel only about matters to which he testified in chief; and (3) in grand jury proceedings, among others, he shall "at his own request, but not otherwise, be deemed a competent witness."

In view of the error in the admission of this testimony, the judgment is reversed.

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

Respondent's petition for a rehearing was denied April 23, 1958. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.

---

or charged with the commission of crimes or offenses, the person accused or charged shall, at his own request, but not otherwise, be deemed a competent witness. The credit to be given to his testimony shall be left solely to the jury, under the instructions of the court, or to the discrimination of the magistrate, grand jury, or other tribunal before which the testimony is given.

"This section shall not be construed as compelling any such person to testify."