[Crim. No. 6907.   Second Dist., Div. One.   Nov. 21, 1960.]

THE PEOPLE, Respondent, v. TONY BROWN
MARTINEZ, Appellant.

530

Gladys Towles Root, Eugene V. McPherson and Robert Barnett for Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

WOOD, P. J.—In an indictment the defendant Tony Brown Martinez and one Augustine O. Martinez were accused in two counts of unlawfully selling heroin. Each defendant admitted an allegation therein that he had been convicted of violating section 11500 of the Health and Safety Code, a felony. Augustine pleaded guilty to Count 1. In a jury trial Tony was convicted on both counts. He appeals from the judgment.

Appellant (Tony) contends that prejudicial hearsay evidence was received, and that "such evidence if excluded would render the evidence insufficient to support the judgment."

Officer Cota testified in substance as follows: On February 5, 1959, about 2:30 p.m., when he knocked on the door at defendant's home (a duplex apartment house), defendant opened the door, and the witness said that his name was Mike Rodriguez and he was a ranch foreman. Defendant invited the witness into his apartment. While going up the stairway toward the apartment the witness saw a Mexican man come

out of a bathroom, and at that time the man had an improvised hypodermic injection outfit in his hand. The outfit appeared to be an eyedropper with a hypodermic needle attached to it. The man handed the outfit to appellant Tony Martinez. Appellant asked the officer what he wanted. He replied that he wanted to "pick up." Appellant asked how much he wanted and the officer replied that he wanted "half a piece." The officer said that the words "pick up" meant "to acquire narcotics"; and that the word "piece" meant an ounce. The officer asked the price of the narcotics and appellant replied, "A hundred and fifty." The officer asked if he could have it at that time, and appellant replied that they should wait because he needed about half an hour to get rid of the persons in his apartment. After the witness had entered the apartment house, another Mexican man entered the place. The officer asked the appellant what kind of a deal he would give on a piece (an ounce). He replied, "$300." The officer said that would be too much but he would give $275. Appellant stated, "I believe I can get it for that." Appellant asked the officer to return in 30 minutes and at that time appellant would have it ready. Then the officer left the apartment and met other officers who were about 75 feet from the apartment. When Officer Cota returned to the apartment about 3 p.m., appellant was on the steps outside the house. The officer asked him if he had the "stuff" ready, and appellant replied, "No, Mike, I am out. I have used the last amount I had to fix with." Appellant also told the officer that he had attempted to get more narcotics from his "connection" but the connection would not have any for two or three days. The appellant asked the officer, "Why don't you go see Teen?" (The officer said that "Teen" was Augustine O. Martinez, who is a codefendant herein and who pleaded guilty to Count 1.) Appellant said, "He'll give you a good deal. He is not using it now, so he won't steal any out of the package. The stuff will be packaged in a little envelope, will be scotchtaped on the end, and if he takes any out the edges will be fuzzy so you can tell if he did take any out." Then appellant said he would call Augustine to see if he was home and to make the arrangements with him. While the officer waited in the living room he heard appellant's voice in an adjoining room but he could not hear any of the words. When appellant returned, he said, "I just called Teen and he is going to be waiting for you; so just drive up to his house and he will be there." The officer said that he was going to see Teen "to

pick up." The appellant replied, "O.K." Then the officer left the apartment and conferred with the other officers who were about five blocks from the apartment.

The officer went to the home of codefendant Augustine O. Martinez and rang the doorbell. Augustine said that he would be right down. Thereafter, Augustine went to the officer's automobile and sat therein with the officer. The officer asked him if Tony Martinez (appellant) had called him. Augustine said that Tony had called him and told him to "pick me up" because Tony's connection was out and had not been able to acquire any narcotics. The officer asked Augustine if he could get a "quarter piece" and Augustine replied that he could get it and it would cost $75. Augustine told the officer that he would have to trust him with the money and that he would not take the officer to the connection, but he would have to spot the officer two or three blocks away from the connection's house. The officer said that he did not want to pick up the narcotics at that time because he had to make a business call and he did not want to have the stuff on him. Then the officer left Augustine and went to the place where the other officers were. When Officer Cota returned to Augustine's home, Augustine entered the officer's automobile and directed the officer in driving to a parking lot in the housing project where Tony (appellant) lived. At that time the officer gave $75 to Augustine, who left the automobile and walked along Concord Street which was in the vicinity of Tony's home. After Augustine had been gone about an hour the officer proceeded to drive around the block, and while he was driving he saw Augustine on the sidewalk. After the officer parked his automobile, Augustine came across the street, entered the automobile, and handed a white package to the officer. The package, which contained a white powder, was a part of a white envelope and was scotch-taped on the end in the same way which Tony had said it would be taped. After the officer and Augustine had returned to Augustine's home, Augustine told the officer to call him if he needed any more stuff.

Officer Cota testified further as follows: The next time he saw Tony was on February 17, about 4:30 p.m., when Tony drove an automobile into a parking lot near Tony's home, which lot was opposite the parking lot where the officer and Augustine were on February 5. The officer told Tony that he wanted to see Augustine because the last stuff the officer got from Augustine was short. Tony asked how short it was, and the officer replied that after he cut the narcotics he had

7 grams. The officer also told Tony that he had come over to talk to him about "the delivery" in Simi which they had talked about previously. Tony replied that he thought he could make the delivery, but his connection was not "around" and he could not find him. The officer asked if Tony would give him the kind of deal they talked about "last time" which was $275 for two ounces. Tony replied in the affirmative. The officer said he would pay $300 if Tony delivered it in San Fernando. Tony said that he had not located his connection but as soon as he "found out something" he would call the officer. The officer said that he did not want to go back empty handed. Tony said he was going to get a newspaper at the grocery store and "I'll call Teen [Augustine]." Tony asked the officer to go with him. They went to a nearby grocery store where Tony, after buying a paper, entered a telephone booth and placed a call and said, "Hello, Teen, this is Tony. Mike is here and wants to pick up." Then Tony closed the booth door, and thereafter the officer could not hear. After the door had been closed about two minutes, Tony opened the door and said, "Mike, Teen wants to talk to you." Tony handed the telephone receiver to the officer who identified himself (on the telephone) as "Mike." The other person who was talking on the telephone said, "Mike, this is Teen" and "I'm sure sorry about the other night. I only wish I could have taken you along with me. That way you'd know for sure what you were getting. But as I told you, these guys are awful leery and they don't want me to bring any strangers around. I was just talking to Tony about his connection being busted. It's in the newspaper." The officer asked Augustine, "Did Tony tell you I wanted to pick up?" He replied, "He told me. I can get you a good deal. I have got a good connection now and I can get you 70 caps for $75.00." The officer said, "Can you pick it up today?" Augustine replied that he would call immediately and make arrangements. After the officer told him to go ahead and make the arrangements, Augustine asked where he could call the officer "back." Then the officer asked Tony where he could wait for the call. Tony replied, "Tell him we'll be over at my sister's house." The officer told Augustine that "we would be at Tony's sister's house [which is the same house where Tony lived]." While Tony and the officer were walking to the sister's house, Tony said that his connection had been busted or arrested; and Tony showed him a writing that was in the newspaper. Soon after they arrived at the sister's [and Tony's] house, Tony

answered the telephone. After that telephone conversation, Tony told the officer that Augustine would be waiting for the officer. Tony also said, "Why don't you see Augustine and see if he can't get those ounces, because I may not be able to get it; but I'll try anyhow and give you a call." Then the officer left the house, reported to the other officers, and went to the home of Augustine and sounded the automobile horn. Augustine came to the automobile and said that he had made the arrangements and that the guy would be waiting "back of a super market." At that time, about 5:20 p.m., Augustine directed the officer in driving to the front of the market, and he told the officer to park there, and that delivery would be made in the parking lot at the rear of the market. The officer gave Augustine $75. Augustine left the automobile and entered the market. When he returned about an hour later, the officer asked him if he got the stuff. He said, "Yes. I'll give it to you in a minute." Then they went, in the officer's automobile, to the front of Augustine's home. While they were in the parked automobile at that place, Augustine handed the officer a cellophane package containing 70 capsules of white powder. The officer told Augustine that Tony wanted to know if Augustine could deliver "a couple of pieces of stuff" — due to Tony's connection having been arrested. Augustine said he would see what he could do. In response to the officer's question as to the price, Augustine said it would probably be "around" $325. The officer said he would call him in the near future.

A chemist testified that the packages above referred to contained heroin.

Tony was arrested on February 21, 1959, about 11:45 a.m., in the presence of Officer Cota and three other officers. Officer Cota testified that, at the time of the arrest, Tony looked toward him and said, "I knew he was heat the first time I dealt to him." That officer also testified that he saw a "fairly recent mark" on Tony's arm; that later, on the day of the arrest, Cota and Bark had a conversation with Tony, wherein Tony said that he remembered placing a telephone call to Augustine on February 5, but he was only doing Officer Cota a favor; he remembered seeing Officer Cota on February 17; he remembered placing a telephone call when he was at the grocery store; the last time he "fixed" was the preceding night, and he did it in order to sleep, and he was trying "to kick the habit"; he and Augustine had been suspicious of Officer Cota and on the previous day (day before arrest)

they "had talked it over, and they were both suspicious and that both of them knew that they were dead at that time."

Officer Bark testified that, in the conversation on the day of the arrest, Tony said he remembered that Officer Cota came to his house on February 5 and that he (Tony) made a telephone call for Officer Cota; that Tony also said he saw Officer Cota on February 17, and he remembered going to the grocery store and telephoning Augustine for the officer. Officer Bark also testified that he asked Tony why he was selling narcotics; and that he replied, "Well, I don't know why I started again. I guess I needed the money and I don't know."

Augustine Martinez, called as a witness by appellant, testified that Officer Cota came to his house on February 5 and wanted him to pick up some stuff for him; Cota gave him $75 for narcotics, but he did not give any of the money to Tony and he did not get any narcotics from Tony; he got the narcotics from Tito Lopez; he saw Cota at his (witness') house on February 17; Cota telephoned before he came to the house; Cota gave him money to pay for narcotics, but he (witness) did not give any of tie money to Tony; he (witness) secured narcotics for Cota, but he did not get any narcotics from Tony; he and Cota went to a shopping center on February 17, and Cota stayed in the automobile; he (witness) saw Lopez on that day; he had not seen Tony since Christmas; he denied that he told the officers that Tony had called him twice and asked him to help Cota.

Appellant (Tony) testified he had not seen Augustine since Christmas; he did talk to Augustine on February 5; a few weeks before February 5, one Correa introduced Cota to him (witness) as a friend from Santa Barbara; about February 5 Cota came to his house and said he wanted to buy half a piece; he (witness) replied that he did not have anything and could not get anything; on February 17, when Tony drove into a parking lot, he saw Cota in a nearby parked automobile; Cota asked Tony about getting two pieces of heroin; Tony replied that he could not get anything; Cota asked if he could use the telephone, and Tony told him there was a telephone at the grocery store; they went to the store and, while Cota was in the telephone booth, Tony bought a newspaper; when Cota came out of the booth he said he had fixed everything; Tony did not see Cota again until February 21 when Cota arrested him; after the arrest Cota made statements regarding things that Tony allegedly did, and he asked

Tony if he remembered those things; Tony replied that he did not remember them; Tony had been convicted of grand theft in 1948; he had used narcotics. He denied that he told Officer Bark that he did not know why he was selling narcotics.

Officer Wells, a rebuttal witness, testified that he had a conversation with Tony on February 21, after the arrest; he (witness) asked Augustine if he recalled selling narcotics to Cota on February 5 and 17; he replied, "Yes, Tony called me twice and asked me to take care of Mike [Tony]"; that Augustine also said he had obtained loose stuff on the first occasion and 70 caps on the second occasion.

▉▉▉ Appellant contends that the court erred in receiving certain testimony. The first specification of error in that respect pertains to the testimony of Cota to the effect that on February 5 he saw a Mexican man, with a hypodermic outfit in his hand, come out of a bathroom which was in the apartment house where appellant lived; and he saw the man hand the outfit to appellant. Appellant argues that that testimony was a reference to another offense which was not connected with the alleged transactions herein and that such reference was prejudicial. Appellant argues further that such "testimony concerning the possession of narcotic paraphernalia was not so closely connected with the main fact of offering to sell narcotics as to constitute a part of it, and without knowledge of which the main fact might not be fully understood." That testimony related to an incident that occurred immediately preceding the conversation between appellant and Cota regarding a sale of narcotics. Such an incident, involving the handing of an improvised hypodermic outfit to appellant, was not a remote circumstance wholly unrelated to the charges herein, but it was a part of the surrounding circumstances under which the negotiations for selling narcotics were commenced, and it tended to indicate a probability that appellant had familiarity with narcotics and had narcotics in his possession, or could obtain some, for use in the outfit or for other uses. As above indicated, Appellant claims in effect that the testimony that a hypodermic outfit was handed to him was erroneously received because that testimony impliedly involved him in another offense, namely, unlawfully using or administering narcotics.

▉▉ In any event, even if it be assumed that the testimony was erroneously received, the error was not prejudicial, for the reason that appellant's own testimony (on direct examination) involved him in the same manner—he testified that

he has "taken a fix [injection of narcotics] every now and then."

Appellant's second specification of error with respect to receiving evidence is that, in another instance, the trial judge solicited reference to other crimes. While counsel for appellant was cross-examining Officer Bark he asked questions as to what appellant said in a conversation with the officer (witness). One answer of the witness was: "I asked Tony . . . about his past and so forth, and he stated to me that——." Thereupon, counsel for appellant said: "Just tell us what he said about this case; not his past." The witness answered: "Well, it's related." Then the judge said: "Go ahead, tell us what he said about this case. Its relationship will undoubtedly come out then." (This is the question to which appellant refers when he asserts that the judge solicited reference to other crimes.) The witness answered that question as follows: "I asked him why he was selling narcotics. I said, 'After all, you have been in the institutions before and I would have thought that by now you were going to give up this type of life.' And he indicated 'Well, I don't know why I started selling again. I guess I needed the money and I don't know. I think this is the last time I'm ever going to fall.'" The portion of that answer which relates to other crimes is the portion relative to appellant having been in institutions before. Nothing in the record indicates that the judge should have anticipated that such a reference would be made by the witness. Appellant testified, in response to questioning by his counsel, that he had been in San Quentin for grand theft; he had used narcotics; and he had been arrested, a few times for narcotic addiction, in Ventura and Oxnard; and he has "taken a fix every now and then." It does not appear that the judge, by asking said question, solicited reference to other crimes. Appellant did not object to the question, nor move to strike the answer. There was no prejudicial error by reason of the answer.

The third specification of error is that the court erred in receiving, over appellant's objection, testimony as to conversations between Officer Cota and Augustine which conversations were not in the presence of appellant. Appellant argues that the conversations were hearsay as to him. The principal acts constituting the sales herein, i.e., the taking of the money and the delivery of the narcotics, were performed by Augustine. It is apparent that the case was

tried on the theory that there was a conspiracy between appellant and Augustine to commit the alleged crimes. Appellant's counsel understood that that was the theory of the trial. While he was arguing against an objection to one of his questions he said: "I have a right to inquire into the facts. After all, they're trying this case on the theory of a conspiracy and there are all kinds of statements by Augustine Martinez here outside the presence of this defendant [appellant Tony Martinez]." Section 1870 of the Code of Civil Procedure provides, in part: "[E]vidence may be given upon a trial of the following facts: . . . 6. After proof of a conspiracy, the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy; . . ." The proof, referred to in that section, may be prima facie proof of a conspiracy. (*People* v. *Catlin,* 169 Cal.App.2d 247, 252 [337 P.2d 113].)

▉ A conspiracy may be established by circumstantial evidence, and it is not necessary to prove that the parties entered into a definite agreement, but it is sufficient if they tacitly come to a mutual understanding to accomplish the unlawful act. (*People* v. *Calhoun,* 50 Cal.2d 137, 144 [323 P.2d 427].) Such an agreement may be inferred from the acts of the parties. (See *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17].)

With reference to prima facie proof of a conspiracy, there was evidence that on February 5 appellant told Cota that the price of a half ounce of heroin was $150; appellant told Cota to wait about half an hour so that appellant could get two Mexican men out of his apartment; when Cota asked about getting an ounce for $275, appellant told him that he believed he could get it for that amount; when Cota returned approximately half an hour later and asked appellant if he had the narcotics, appellant replied that he was "out" and he had used his last amount to fix himself; then appellant asked why Cota did not see Augustine who would give him a good deal; appellant described in some detail the manner in which the narcotics purchased from Augustine would be packaged; appellant said he would call Augustine to see if he was home and to make the arrangements with him; appellant went into another room and had a conversation with someone; when appellant returned to the room where Cota was, he said that he had called Augustine and he will "be waiting for you." Also, there was evidence that on February 17 when Cota told appellant that the last stuff he got from Augustine was short, appellant asked how short it was; Cota asked if appellant would make delivery of two ounces for

$275 according to their previous discussion; then appellant asked Cota to go with him to a grocery store; when they arrived there, appellant called Augustine by telephone and said that Cota wants "to pick up"; when appellant told Cota that Augustine wanted to talk to him, Cota talked to Augustine on the telephone, and Augustine made statements which indicated that he was referring to the shortage on the other deal; while Cota was having the telephone conversation with Augustine, he asked appellant where he (Cota) could wait for Augustine to call "back"; appellant replied, "Tell him we'll be over at my sister's house [appellant's house]"; later, while they were at appellant's house, appellant answered the telephone and then told Cota that Augustine would be waiting for Cota. [4b] There was at least prima facie evidence of a conspiracy. The court did not err in receiving the evidence relating to the conversations with and the acts of Augustine.

The evidence was sufficient to support the judgment.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.