Filed 7/6/15  P. v. Davis CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>HAROLD DAVIS,<br><br>　　　Defendant and Appellant. | F065980<br><br>(Super. Ct. Nos. MCR039758 &<br>MCR039637B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Law Offices of Allen G. Weinberg, Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A.  Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Codefendants Harold Davis, Jeremy Seamon, and Lisa Seamon were charged by information as follows: Harold[1] was accused of possessing methamphetamine for sale (Health & Saf. Code, § 11378, count 1) and opening or maintaining a place for unlawfully selling, giving away, or using methamphetamine (Health & Saf. Code, § 11366, count 2); Harold, Jeremy, and Lisa were jointly accused of conspiring to sell methamphetamine (Health & Saf. Code, § 11379 & Pen. Code,[2] § 182, count 3); Jeremy and Lisa were jointly accused of possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a), count 4); and Harold and Lisa were jointly accused of conspiring to prevent or dissuade a witness from attending or giving testimony at any trial, proceeding, or inquiry authorized by law (§§ 136.1 & 182, count 5) and attempting to prevent or dissuade a witness from attending or giving testimony at any trial, proceeding, or inquiry authorized by law (§§ 136.1 & 664, count 6). The jury found Harold and Jeremy guilty as charged and found Lisa guilty on counts 3 and 4 and not guilty on counts 5 and 6.

On appeal,[3] Harold argues that (1) Lisa's acquittal on count 5 necessitated reversal of his own conviction on the same count; (2) the evidence did not support his convictions on counts 2 and 5; and (3) execution of punishment on count 2 should have been stayed pursuant to section 654. We disagree with each contention and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

### Prosecution case-in-chief

#### a. Initial search of 1933 West 4th Street

On November 4, 2009, Detective Brian Esteves and other law enforcement agents executed a search warrant on a residence located at 1933 West 4th Street in Madera. In

---

[1]To avoid confusion and for consistency, we identify appellant and codefendants by their first names. No disrespect is intended.

[2]All further statutory references are to the Penal Code unless otherwise indicated.

[3]Neither Jeremy nor Lisa is a party to this appeal.

the northeast bedroom, they came across Jeremy, Lisa, a bag of methamphetamine, traces of methamphetamine on top of a mirror, and other drug paraphernalia. Jeremy and Lisa admitted that this methamphetamine belonged to them and they had ingested the substance the night before. In the southeast bedroom, agents encountered Mario Pettit, Lisa's father. At the back of the house, 16 color-coded bags of methamphetamine were discovered inside a porch lamp. Bags marked with the color black weighed 0.5 grams. Bags marked with the color red weighed 0.8 grams. Bags marked with the color green weighed 1.9 grams.

In the east bedroom, agents found Harold and a whiteboard displaying pay/owe information—i.e., "different names with dollar amounts"—in black, red, and green ink. Harold's possessions included a black T-shirt bearing the slogan "Stop Snitching," safe keys, a wallet containing approximately $800 in cash, and a cell phone.[4] Via text message, Lisa advised that "people were coming by the house looking for Harold," and other individuals solicited "half a pizza"; requested meetings in gas stations, grocery stores, and other public places; described "what vehicles they would be in when they showed up"; and commented on the difficulty of keeping in touch due to frequent phone number changes. In Harold's truck, agents retrieved a blue notebook displaying more pay/owe information.

Art Zamora, a neighbor, informed agents that Jeremy and Lisa lived at 1933 West 4th Street for "maybe a couple of years," whereas Harold arrived "a couple months" before November 2009. Once Harold moved in, Zamora observed a "[l]arge number of traffic coming in and out of the residence …, usually after 11 p.m., sometimes [until] 1:00, 2:00 a.m.," approximately three or four days per week. These visitors appeared only when Harold's truck was at the house.

---

[4]At the residence, Esteves found a cell phone bill identifying Pettit as the payor.

### b. *Initial jail call and visits*

Harold called Lisa[5] from jail on November 4, 2009. He instructed her to contact and collect debts from various persons. In particular, Harold identified Wesley Snipes,[6] who owed approximately $200 or $250. He then instructed Lisa to inform anybody "com[ing] by looking for [him]" that "'[h]e's in jail,'" "[there's] '[n]o stuff,'" and "everything's gone."

Jeremy visited Harold on multiple occasions. During one visit, Harold noted that "any money [they] get from the car parts is for the attorney." Jeremy remarked that Lisa was "going to [Snipes's]" to "divide" the "car parts and stuff." Harold asked Jeremy to "show up on Monday at [the former's] court date," "pull [the public defender] off to the side," and "say, look, whatever they found, … [Harold's] off in space about it." Jeremy declared that he was "gonna do [his] best on that" and "not gonna let [Harold] do … the time that they're wanting [him] to do." Harold apologized for the "inconvenience" and assured that "better times [were] ahead" and "[e]verything's gonna be taken care of." In addition, the following exchange occurred:

> "[Harold]:     … Hey, they didn't—they didn't …
>
> "[Jeremy]:     Yeah.
>
> "[Harold]:     Right?
>
> "[Jeremy]:     Yeah. No, no, no, no. There—there's only the light.
>
> "[Harold]:     Yeah. Yeah. And—and—and—and …
>
> "[Jeremy]:     No, they didn't…. [¶] … [¶]
>
> "[Harold]:     [S]o they didn't get the places that were really fucking packed full of shit and fucking shit everywhere, huh?

---

[5]Both Jeremy and Lisa had been released on bail by this point.

[6]In connection with this case, Snipes was convicted of possessing methamphetamine for sale and conspiring to distribute methamphetamine.

"[Jeremy]:     No …."

During another visit, Harold disclosed that he recruited an 18-year-old male named Josh to "take … under [his] wing." Josh would "kick back in [Harold's] room until [Harold came] home" and function as "a follower" rather than "a leader." Next, Harold inquired about "the big nuts and bolts and stuff," "the toolbox with the little nuts and bolts," and the "sets of tires." The following dialogue ensued:

"[Jeremy]:     [Pettit] got rid of that shit.

"[Harold]:     Why?

"[Jeremy]:     I don't know. He think—'cause, uh, I guess he thought it was—and they had no—no reason for it. He—well he spent more of it—I guess he thought it was rusted nuts and bolts so he, uh—lawn mower. Or, no, I mean, um, the hose. The whole fucking thing they [half]. But not the … big nuts and bolts, you know. He kept those. And that's what went out to, um …

"[Harold]:     So you're telling me that … there's no coming back from that?

"[Jeremy]:     No. 'Cause he got rid of that whole fucking thing.

"[Harold]:     Oh. Right. What the fuck is wrong with him, bro? [¶] … [¶]

"[Jeremy]:     He flipped. [¶] … [¶]

"[Harold]:     I need to know—I need …

"[Jeremy]:     I'd say it was about a half of, uh—that motherfucker, you know. I been trying to …

"[Harold]:     He got rid of all them sets of tires back there? Half of those sets of tires I had?

"[Jeremy]:     Yeah. Except for the big ones.

"[Harold]:     Goddamn. Oh, except for those all-terrain ones?

"[Jeremy]:     Yeah.

5.

"[Harold]:    Okay. [¶] … [¶]  Because, dude, I had like so many sets of tires, bro …."

### c.    *Subsequent search of 1933 West 4th Street*

Esteves authored a subsequent search warrant and conducted another search at 1933 West 4th Street.  He found a November 5, 2009, letter from Harold addressed to Jeremy and Lisa.  In the letter, Harold mentioned that Josh was "'going to be working for [him]'" and "'going to do all the running[7] for [him.]'"

Lisa, who was present during the search, admitted to Esteves that agents missed additional methamphetamine "outside the house" during their initial search.  Half of the substance was flushed down the toilet by Pettit while the other half—i.e., "two or three [eight] balls"[8]—were given to Snipes.  Lisa acknowledged that she obtained the debts "she was supposed to collect" and "put [the money] on Harold's books …."[9]

### d.    *Investigation of Snipes*

On December 23, 2009, Esteves—posing as an acquaintance of Harold's who had been released from jail—phoned Snipes.  The two spoke about the aftermath of the November 4, 2009, search:

"[Esteves]:    'The other thing is uh, I guess uh [Pettit] was trippin' after uh the cops left and the stuff they didn't found apparently Lisa an[d] Jeremy are saying [Pettit] tripped out an[d] like threw 1/2 of it away.  [¶]  So [Harold]'s not real sure on his inventory, like what, you know what I'm saying? [¶] … [¶] So he was wanting me to get like an inventory to see, you know what exactly he was setting at.  [¶]  You know what did Lisa and Jeremy bring over or were they bullshitting, saying that [Pettit] threw 1/2 of it away, you know.'

---

[7]According to Esteves, "doing all the running means they're going to be making the deliveries, actually meeting up with … the customers and completing the transactions."

[8]Per Esteves, an "eight ball" referred to "one eighth of an ounce" of a drug.

[9]Again per Esteves, "books" referred to "money someone has on their inmate account at jail."

"[Snipes]:     'Yeah, they brought me like 3/4's.  [¶] … [¶]  3/4's of an "O."
              [¶] … [¶]  I mean I think they gave me, they had a little bit
              left, they still behind, they gave me a 1/16 or eight ball,
              something like that, something like that.'"

Thereafter, Esteves searched Snipes's residence and found 3.8 grams—i.e., about one-eighth of an ounce—of methamphetamine in a bag, a digital scale with methamphetamine residue, and a cell phone.  In a text message, someone named Chuck Trollinger asked for $20 worth of methamphetamine.  Esteves—pretending to be Snipes—replied back and arranged a meeting to complete the transaction.  Trollinger appeared at the designated location with $20.

On December 3, 2010, the prosecutor identified Snipes as a potential witness.

### e.     *Subsequent jail calls*

In December 2010, Harold made jail calls to Lisa and his ex-wife, Kodie[10] Davis. In a December 3, 2010, call, Lisa apprised him of Kodie's attendance at court that day. The following exchange occurred:

"Harold:     'I need to … speak with [Kodie].  [¶] … [¶]  You know
             why?'

"Lisa:       'Why?'

"Harold:     'Because she … has to go talk to bonehead right away.'

"Lisa:       'Okay.'  [¶] … [¶]

"Harold:     'Did you tell her [a]bout what happen[ed] today?'  [¶] … [¶]

"Lisa:       '[A]bout what happen[ed] in court you mean?'

"Harold:     'Yeah.'

"Lisa:       'No, I haven't talked to her.'

"Harold:     'Well she's gotta talk to bonehead right away.'

---

[10]The record alternates between the spellings "Kodie" and "Cody."  For consistency, we solely use the former.

"Lisa:          'I will, I will get a hold of her.'

"Harold:        'And I mean, I mean, she's gotta go today.  You know what I mean?'

"Lisa:          'Yeah.'

"Harold:        'And, you know, I mean I really don't care but the only thing is, I mean you know.  I mean, she needs to go tell bonehead umm everything that's coming or whatever.'

"Lisa:          'Yeah.'  [¶] … [¶]

"Harold:        'And I would rather it get done tonight, or you know, I'd rather it try to be done tonight.  [¶]  Um, if, if Kodie go and, and take care of that, or whatever, you know what I mean?'

"Lisa:          'Yeah, the only thing I do is tell her, you know.'  [¶] … [¶]

"Harold:        '[I]f you have to, if you have to, give her a ride you know what I'm saying.'

"Lisa:          'Yeah.'

"Harold:        'Um, and, and, and you know I mean, make sure …'

"Lisa:          'She has a car.'

"Harold:        'Yeah, I know but make sure, I mean ….  [¶]  I know, but if you have to, to make sure, you know she can get done, or whatever.  You know what I mean?'

"Lisa:          'Yeah.'

"Harold:        'You know, and since, you know, I mean since you'd have to drive all the way across town ta do it .…  [¶]  You know what I mean?'

"Harold and Lisa:    (laughs)

"Harold:        'No, um, but I just think it needs to be … aware, you know of what's, um, you know transpiring.'

"Lisa:          'Yeah.'"

8.

In a December 7, 2010, call, Harold and Lisa talked about Kodie's failure to contact someone named "Janet":

"Harold:    'Um, Kodie told me that … she went and tried to talk to, uh .… [¶] I don't know if you explained the situation to her, but she went off to go … talk to Janet in the apartment. [¶] … [¶] … I don't know … what kind of message you gave her, but she said she tried to go, she went over to Janet's and knocked on the door and nobody answered.'

"Lisa:    'Hmm, I know that. [¶] … [¶] It is not my fault.'

"Harold:    'Are you aware that she went to the wrong place.' [¶] … [¶]

"Lisa:    'Oh yeah, 'cause … Kodie called me today. Well, she probably already tell you.' [¶] … [¶]

"Harold:    'But um, ok now, do you … understand who … I was talking 'bout when I said Janet in the apartments right?'

"Lisa:    'Yeah.' [¶] … [¶]

"Harold:    'Okay, um. Okay, let's see if this rings a bell: I could usually throw up … like a little hand thing and you'll know who I'm talking about.'

"Lisa:    'Yeah. [¶] … [¶] I know who you're talking about. Yes.'"

Harold and Lisa's conversation on December 8, 2010, indicated that Kodie still did not touch base with Janet:

"Harold:    'The reality of the situation here … is … we're sitting here for Kodie to go talk to Jan in the apartments .… [¶] [Y]ou know if … this ain't gonna be done by her anytime soon, or anybody else, … maybe it'd be good if … you know you, uh .…'

"Lisa:    'I take it into my own hands, I got it.'

"Harold:    'You know, tomorrow or something, you go talk to "Make it Happen Captain," you know?'

"Lisa:    (Sighs) 'Yes.'

9.

"Harold:    'Explain the situation and … explain to her that you know, when uh …. [¶] Obviously when somebody's gonna be coming around, sticking their nose around soon, and uh you know …. [¶] She just needs ta shut tha fuck up.'

"Lisa:    'Yeah.'

"Harold:    'I mean, that would really be very wise.' (laughs)

"Lisa:    'Yeah.' [¶] … [¶]

"Harold:    'I'm already hoping [you're] on the same … level, … maybe, you know you can talk to her and make sure she's gonna be on the same uh, with uh, you know.'

"Lisa:    'I gotcha.'

"Harold:    'You know, that way you know, if she does happen to … get up on the throne … um you know what I mean …. [¶] … [¶] … You know maybe um, if she can be the cause or uh, all eyes can look on ….' (Laughs)

"Lisa:    'Yeah.'

"Harold:    'Anywhere but at me. (Laughs) [¶] I'm just saying.'

"Lisa:    (Laughs) 'Yeah.' [¶] … [¶]

"Harold:    '[W]hat I would do is … make sure that first off you uh, you uh come in a good way, you know what I mean?'

"Lisa:    'I know, I know.'

"Harold:    'Come in a good way so nobody um feels ah, awkward or, or anything like that.' (Inaudible.)

"Lisa:    'Yeah.' [¶] … [¶]

"Harold:    'So tomorrow …. [¶] …[¶] [F]irst thing when you get home, I don't know if you're gonna take your dog for a walk, but you know …. [¶] … [¶] … I'm just saying that's a long way to walk, all the way over to the apartments across town.'

"Lisa:    'I know.' [¶] … [¶]

"Harold:    'Yeah and if you have to, go take the ex-wife with you.'

10.

"Lisa:          'Okay.'"

Harold spoke to Kodie directly on December 9, 2010:

"Harold:        'Hey, uh, why don't you do me a favor?'

"Kodie:         'What's that?'

"Harold:        'Why don't you go pick up … your friend down the street, right.'

"Kodie:         'Um, um down the street from where I'm at?'

"Harold:        'Yeah.  [¶] … [¶]  [G]o pick up "L," okay.'  [¶] … [¶]

"Kodie:         'Go pick up "Carol?"'

"Harold:        'NO, go pick up "L," and you guys ….'

"Kodie:         '"Gail?"'

"Harold:        'L.  L.'

"Kodie:         'Oh, okay.'

"Harold:        'And then (clears throat), why don't you guys go and uh go over by where your cousin used to live, you know over by 420.'

"Kodie:         'Yeah.'  [¶] … [¶]

"Harold:        'Why don't you guys go over there and um, see how that works out.'

"Kodie:         'Okay, I can do that.'  [¶] … [¶]

"Harold:        '[C]an you make sure you do it today?'

"Kodie:         'Mm hmm.'

"Harold:        'I, I figure like this, I figure ….'

"Kodie:         'But.'

"Harold:        'If "L" goes.'

"Kodie:      'Um, I heard that um, he's in Bakersfield.  [¶] … [¶]  In some kind of program down there.'

"Harold:     'I heard he was too, but I heard that, um, that ….'
[¶] … [¶]  … Okay, I know, I know well I heard, I heard that, that person just resurfaced so.'

"Kodie:      'Okay.'  [¶] … [¶]

"Harold:     'Okay, and you know why don't you call, why don't you call her and make sure she's up and around and dressed, so she'll be ready when you stop by to pick her up.'

"Kodie:      'Alright.'  [¶] … [¶]

"Harold:     'So, um, will you do that call her and make sure, um, awake and dressed and all that, or she's gonna be dressed and then um, when you go over to these apartments to speak with this lady that you have her wait in the car until you find out what's up.'

"Kodie:      'Alright.'

"Harold:     'And then you know, … if she's there, and she comes out maybe you can call her outta the car, you know what I mean.  [¶] … [¶]  … She, you know, she understands that … she's on the certain level already and … she's just gonna help make sure that, I guess she is too.  Or whatever, you wanna call it, whatever.'

"Kodie:      'Alright.'"

Harold and Lisa's final conversation on December 10, 2010, revealed that Lisa and Kodie had not yet visited Janet:

"Harold:     'Hey, um did you uh, has Kodie called you?'  [¶] … [¶]

"Lisa:       'Well I talked to her yesterday and told her that I'd be down at seven if she was gonna be home.  She said that she was, and it was, I don't know, probably about 10:15 when I got home and everything, and I text her and told her if she was gonna be home 'cause I was gonna come down there right then and she never text me back.'  [¶] … [¶]

"Harold:     'Um, she was supposed to come pick you up.'

12.

"Lisa:        'Was she?  That never happened.'

"Harold:      'Yeah well that's what was supposed to happen.  [¶]  I been um, telling her how important this is but you know, I mean, you know like obviously you know, nobody, why would anybody else, uh you know.  [¶] … [¶]  And she was gonna take you to go talk to … Janet over in the apartments.'

"Lisa:        'Yeah.'

"Harold:      'You know "Make it Happen Captain."'

"Lisa:        'Mmhmm.'  [¶] … [¶]

"Harold:      'She told me, well, I went and knocked on her apartment ….  [¶]  And I was like, you went to the apartment door and you knocked on the apartment door?  I was like [you're] fucking retarded!  You know what I'm saying.  [¶] … [¶]  [A]nyways, um she was basically gonna come pick you up and uh you know, and … she was like, well, well if I'm gonna go an[d] uh, you know do this and go up to the door and knock and this and that, what good is that gonna do?  [¶]  I was like well the good that's gonna do is uh, [you're] familiar with the family.'

"Lisa:        'Yeah.'

"Harold:      'So you know, if you go you know talk with the family an[d] say, you know, hey is Jan there and when Janet comes outside to talk to you, you know then you could be like, hey, you know, call her in the car and be like come here for a sec, you know what I mean?'

"Lisa:        'Yeah.'

"Harold:      'And I'll be, like that way um, you know you can initiate the … communication and then that way you know, you know you can call her out of the car.  That way [you,] her and Janet can get on the same level.'

"Lisa:        'Yeah.'  [¶] … [¶]

"Harold:      'Do it in a way you don't have to be a rocket scientist, to you know, um, um figure all that out.  I mean there should be … that should be, um fucking elementary, it should be easy.'

13.

"Lisa:      'Yeah.'  [¶] … [¶]

"Harold:    '[A]nyways, so that was supposed to happen but that never happened right?'

"Lisa:      'No.'  [¶] … [¶]

"Harold:    'So if you can try to work something out with her, um like the sooner the better, you know.'

"Lisa:      'Okay.'

"Harold:    'Um, so, um, you know, so you can basically let Janet know you know what's, what's coming, you know?'

"Lisa:      'Yeah.'

"Harold:    'And all that so, um the faster you guys take care of that the better off um ….'

"Lisa:      'You'll feel.'  [¶] … [¶]

"Harold:    'So you know when you guys get some time you know, she gets um, go over there you know, (inaudible) make it happen.'

"Lisa:      'Well I can make time, you know?'

"Harold:    'That's what I'm talking 'bout.  And then maybe if you call, if you're calling Kodie to say, hey you know we need to, you know we need to take a ride over to Janet's and go you know talk to her.'

"Lisa:      'Yeah.'

"Harold:    'Then, hey maybe that'll help her be like oh, that's right, you know, let's let's go, you know 'cause um, it'd really be um, it would really um, be a helpful kind of thing, hopefully.'

"Lisa:      'Yeah.'

"Harold:    'Even, even if it's not oh well, I mean, I mean it can't get any, I guess, you know.  I would say it can't get any worse. (Laughs.)  You know what I mean?'

"Lisa:      'Yeah.'

14.

"Harold:      'But um, you know if you can you now just kinda get Janet on the same, same page that [you're] on and, um this n' that ....'

"Lisa:      'I will do what I can.'

"Harold:      'That's my girl.  Thank you.'"

### f.    *Testimony of Esteves*

At trial, Esteves opined that the phrases "half a pizza," "car parts," "nuts and bolts," and "sets of tires" were code words for methamphetamine:

"During my career I've investigated several cases where people will use code to refer to narcotics.  I've heard food, tools, women ....  [¶] … [¶]

" … The half a pizza, I believed they were talking about half a gram of methamphetamine, and I find this consistent with what was found in the house with 11 of the bags weighing a half a gram.  And also the fact that it's not a reasonable request to call someone and ask for half a piece a pizza.  [¶] … [¶]

"[T]he call we just listened to …, the jail visit in its entirety between Harold and Jeremy, the portion where they're talking about nuts and bolts and flushing and rusty nuts and bolts.  It's apparent there to me that they're … using a code to talk about methamphetamine.…"

"When they're talking about the nuts and bolts, you'll notice Jeremy lowers his voice and he's whispering … and then subsequently later in the call … when they're still talking about the nuts and bolts, [Harold] switches the code to [all terrain] tires.  They're talking about the big nuts and bolts, and then, 'Oh, you mean those big [all terrain] tires?  All my [all terrain] tires?'  So they're not staying consistent with the code.  They're whispering and trying to cover up the phone and being choppy when they're talking about something that's legal.  I mean, car parts and engines and nuts and bolts are legal items.  There would be no need to disguise what they're talking about there."

Esteves also determined that "Janet" referred to Snipes:

"[Janet]'s a female by the name of Janet Sobel and she lives at 1205 East Cleveland ....  [¶] … [¶]  It's on the other side of town, [Jeremy and Lisa] live on the west side of town and Janet lives on the east side.  [¶] … [¶]

"From listening to the context of all the calls … it's apparent that when they're referring to … Janet and the apartments, they're actually talking about … Snipes who lives just a few blocks away. Again, it's another code to try to hide what they're, in fact, doing. [¶] … [¶]

"[Snipes] lives in a house. [¶] … [¶]

" … If you listen on the calls, they'll be referring to Janet in an apartment, and then they switch to he, so they're switching to he/she … which indicated to me they're not actually talking about Janet. And if you'll listen to the call, I sense … some heavy sarcasm when we're referring to since you have to go all the way across town. Also, [Harold] says, 'If you're going to walk your dog later, I mean, I know you'd have to walk all the way across town,' these are things that raise my suspicion that they were probably talking about [Snipes].… [¶] … [¶]

"I also believe they're talking about [Snipes] as opposed to Janet when [Kodie] tells him that he's in a program down in Bakersfield .…"

"When I served [Snipes] with the subpoena on the original proceedings, I drove to his inpatient program. [¶] … [¶] In a town called Shafter, which is close to Bakersfield."

"Also, the fact where … during the call, Harold's telling Lisa that [Kodie] went over and tried to actually talk to Janet in the apartments. And Harold's saying, 'Do you know that she really went and knocked on Janet's door?' And—and Lisa's—you could tell Lisa doesn't understand the code, and Harold's trying to let her know, 'Hey, we're talking about the wrong person.'"

Based on the items seized and the recorded jail calls, Esteves concluded that Harold possessed the methamphetamine at the West 4th Street residence for the purpose of sale:

"First the amount of the drug. They're broken down into 16 separate bags. All of them weighed out to specific weights they're commonly sold in the street. The fact that they're not odd number of weights. They're all identical, color-coded; that is something that is done so that during a hand-to-hand transaction, it can be quickly looked at and know how much is in that bag when a request is made. The text messages located on the phone that [Harold] possessed. The people wanting to meet up with him in public places describing their vehicles. The text message which I believe was referring to methamphetamine code asking for a half a pizza, which is

16.

consistent with the half a gram weights that … were found at the residence. Also the presence of the safe keys on [Harold's] key ring. [¶] … [¶]

"Based on my training and experience, I've encountered individuals who will … keep personal small fire type safes at off site locations. In the narcotics' community these are called stash pads. Commonly a dealer will only keep a small amount which is needed to complete transactions throughout the day. And they will have friends of theirs keep safes at their location. And that way if law enforcement does serve a search warrant on the residence, an entire stash is not taken, only a small amount is lost. [¶] … [¶]

"The presence of the pay/owe sheet on the dry-erase board, which some of the initials corresponds with the names on the pay/owe sheet found in [Harold's] truck with the dollar amounts written next to them. [¶] Much like a legitimate business, drug dealers will keep a record of drugs sold and money that is owed to them. Drug dealers will commonly do what's called fronting drugs; it's basically giving it to them on credit and they can pay later when they have the money. And it's for that reason it's necessary for the dealer to write down the amount that is owed back to them. [¶] … [¶]

"Another factor is the presence of a large amount of cash, when [Harold] explained to me that his only source of employment was doing his aunt's yard, which he stated did not make a lot of money.

"Also the fact that the cell phone that [Harold] was utilizing was in the name of … Pettit. This is done by drug dealers to try to prevent law enforcement from finding which phone they're utilizing and prevent them from monitoring it. Also the text messages on the phone of the female saying it's hard to get ahold of you because you change your number so much. Based on my training and experience, I know that the drug dealers, again, frequently change their number often to make it tough for law enforcement to monitor conversations.

"The presence of the shirt that said 'Stop Snitching' …. '[S]nitch' is a derogatory term for someone who provides information to law enforcement and assists law enforcement in finding and apprehending drug dealers. These type of items are worn or displayed to intimidate someone from providing information to law enforcement or cooperating with us, which in turn makes it tougher to convict them and hold them accountable for their actions. [¶] … [¶]

"Also, a few of the things we heard in the calls where subsequent to [Harold]'s arrest, he's giving Lisa detailed instructions on what to do if

17.

people come by, tell them everything is all gone.  He says if his boss comes by, you know, just tell him everything is all gone.  Also, in the call when he's telling her to collect all the money, he says either have the money or there's one statement where he specifically refers to a tab, 'have all the cash on that tab.'  Again, going like the pay/owe sheet, drug dealers will front drugs on credit, often working like a tab.  And, therefore, he's saying either have the money or have the money that's owed on the tab…."

*Defense case-in-chief*

Ann Ruz, a criminal defense investigator, interviewed Jeremy at 1933 West 4th Street on December 1, 2009.  He confessed that the methamphetamine belonged to him instead of Harold.  At some point, Lisa and Pettit admonished Jeremy for speaking to Ruz.

Pamela Mitchell, Harold's aunt, testified that Harold performed automotive repairs for her small business.

## *DISCUSSION*

### I. *As a matter of law, Lisa's acquittal on count 5 did not necessitate reversal of Harold's conviction on the same count*

Harold claims that his conviction on count 5 must be overturned because Lisa, an alleged coconspirator, was acquitted on the same count.  However, he concedes that this "rule of consistency" was rejected by our Supreme Court in *People v. Palmer* (2001) 24 Cal.4th 856.  The *Palmer* court found that "[t]he general rationale behind the rule has been 'that one may not conspire with himself.'  [Citation.]  It does take at least two to conspire.  But to go '[f]rom this irrefutable proposition' to a rule requiring reversal of the inconsistent verdict is a 'precipitous leap.'  [Citation.]  We find the federal decisions persuasive and, like the high court, conclude that we may accept inconsistent verdicts.  We agree with the conclusion of the Eleventh Circuit Court of Appeals:  'Consistent verdicts are unrequired in joint trials for conspiracy: where all but one of the charged conspirators are acquitted, the verdict against the one can stand.'  [Citation.]" (*Id.* at pp. 864-865.)

18.

We are bound by the doctrine of stare decisis to follow this decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## II.    Substantial evidence supported Harold's convictions on counts 2 and 5

### A.    Standard of review

"When an appellant challenges the sufficiency of the evidence, the reviewing court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511 (*Aispuro*); see *People v. Tripp* (2007) 151 Cal.App.4th 951, 955 ["We must draw all reasonable inferences in support of the judgment."].) "For evidence to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value." (*Aispuro*, *supra*, at p. 1511.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) "If the circumstances reasonably justify the jury's finding, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*Aispuro*, *supra*, 157 Cal.App.4th at p. 1511.)

### B.    Analysis of count 2

"Every person who opens or maintains any place for the purpose of unlawfully selling, giving away, or using [methamphetamine] … shall be punished .…" (Health &

Saf. Code, § 11366, citing, among other things, *id.*, § 11055, subd. (d)(2); see, e.g., *People v. Moseley* (2008) 164 Cal.App.4th 1598; *People v. Ferrando* (2004) 115 Cal.App.4th 917.) "'The proscribed "purpose" is one that contemplates a continuity of such unlawful usage; a single or isolate instance of the forbidden conduct does not suffice.' [Citations.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 718.) Hence, "[t]he elements of the opening-or-maintaining offense are that the defendant (a) opened or maintained a place (b) with a purpose of continuously or repeatedly using it for selling, giving away, or using a controlled substance." (*People v. Hawkins* (2004) 124 Cal.App.4th 675, 680.)

We find that substantial evidence supported Harold's conviction on count 2. The record—viewed in the light most favorable to the verdict—shows that Harold moved into 1933 West 4th Street a couple of months before November 2009. Thereafter, Zamora, a neighbor, noticed numerous visitors coming to the house between 11:00 p.m. and 2:00 a.m. at least three times each week and only when Harold's truck was in the vicinity. This nocturnal influx did not exist prior to Harold's arrival. During the November 4, 2009, search, agents retrieved 16 color-coded bags of premeasured methamphetamine from the inside of a back porch lamp; a whiteboard displaying color-coded pay/owe information, a T-shirt bearing the slogan "Stop Snitching," safe keys, and a wallet containing a significant amount of cash from Harold's bedroom; and a blue notebook displaying more pay/owe information from Harold's truck. Text messages to Harold revealed that (1) "people were coming by the house looking for [him]," and (2) individuals specifically sought methamphetamine—e.g., "half a pizza"—from him. Following his arrest and while in jail, Harold (1) ordered Jeremy, his housemate, to claim ownership of the seized methamphetamine; (2) confirmed that the "car parts," "nuts and bolts," and "sets of tires"—all of which were code words for methamphetamine—that were not taken during the November 4, 2009, search were either mistakenly discarded or transferred to Snipes's residence; (3) instructed Lisa, another housemate, to collect

20.

outstanding debts from buyers and to inform those who "[came] by looking for [him]" that the methamphetamine was unavailable; and (4) procured someone to temporarily "kick back" in his room at 1933 West 4th Street and "do all the running for [him]" until he returned. In view of these circumstances, a reasonable trier of fact could have concluded that Harold, a drug dealer, moved into 1933 West 4th Street, continuously used the residence as a place to conduct methamphetamine sales until his arrest, and intended to maintain the operation via proxy while he remained in jail.

### C. Analysis of count 5

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, quoting § 184.) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*Morante*, *supra*, at p. 416.) "'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and 'thus reaches further back into preparatory conduct than attempt ....' [Citation.]" (*People v. Swain* (1996) 12 Cal.4th 593, 600.) "The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.'" (*People v. Johnson* (2013) 57 Cal.4th 250, 258, quoting *Swain*, *supra*, at p. 599.)

"It is settled that a conspiracy may be established by direct evidence or circumstantial evidence, or a combination of both." (*People v. Calhoun* (1958) 50 Cal.2d 137, 144 (*Calhoun*).) "It is likewise well recognized that the very crux of the conspiracy, the evil or corrupt agreement [citations], may be shown also by circumstantial evidence." (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575.) "It need not be shown that the parties entered into a definite agreement, but it is sufficient if they positively or tacitly

come to a mutual understanding to accomplish the act and unlawful design." (*Calhoun*, *supra*, at p. 144.) "The circumstances from which a conspirational agreement may be inferred include 'the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators ....' [Citation.]" (*People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20-21.)

"[A]n agreement to commit a crime, by itself, does not complete the crime of conspiracy. The commission of an overt act in furtherance of the agreement is also required." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 259.) "'[A]n overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime.' [Citations.]" (*People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8.) "The purpose of the overt act is simply to show that the agreement has proceeded beyond the meeting of the minds stage to some direct or physical act, however innocent in itself, tending toward the furtherance of the objective of the conspiracy." (*People v. Saugstad* (1962) 203 Cal.App.2d 536, 549-550.) "It is sufficient if the overt act represents any step in furtherance of the conspiracy. It may be an otherwise lawful act and it may be merely a part of the preliminary arrangement for the commission of the ultimate offense." (*Id.* at p. 549.) "[T]he jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy." (*People v. Russo* (2001) 25 Cal.4th 1124, 1128.)

Harold asserts that (1) "there was insufficient evidence presented at trial to prove that [he] formed an agreement with Lisa to dissuade the testimony of Snipes," and (2) "there was … no substantial evidence of any overt act …." We disagree. First, the record—viewed in the light most favorable to the verdict—establishes that Harold and Lisa formed an agreement. On December 3, 2010, the same day the prosecutor identified Snipes as a potential witness, Harold and Lisa conversed on the phone. Harold

communicated that Kodie, who attended court that day, needed to "'talk to bonehead right away'" and "'tell bonehead … everything that's coming .…'" Lisa affirmed that she would "'get a hold of [Kodie]'" and relay Harold's message. Already, a reasonable trier of fact could have inferred from these circumstances that "bonehead" referred to Snipes. Subsequent discussions in code between Harold and either Lisa or Kodie and Esteves's trial testimony confirmed that Snipes was indeed the subject and clarified exactly what needed to be articulated to him. In a December 9, 2010, call to Kodie, Harold specified that Kodie would pick up Lisa—i.e., "'L'"—and "'go over to the[] apartments to speak with [a] lady'" who "'just resurfaced'" from a "'program down'" "'in Bakersfield.'" At trial, Esteves pointed out that Snipes had been attending an inpatient program near Bakersfield at the time he was served with a subpoena. In a December 10, 2010, call to Lisa, Harold further detailed that "'[Kodie] was gonna take [Lisa] to go talk to … Janet over in the apartments,'" where "[Lisa] could … call [Janet] in the car,'" and "[Lisa,] [Kodie,] and Janet can get on the same level.'" Moreover, in the previous December 7 and 8, 2010 calls, Lisa indicated that she knew what Harold actually meant by the expression "'Janet in the apartments'" and would "'take into [her] own hands'" the job of convincing Janet to either "'shut tha fuck up'" or "'cause … all eyes [to] look … [¶] … [¶] … [a]nywhere but at [Harold]'" from the "'throne.'" Esteves deduced from the entirety of Harold's recorded calls that "Janet" referred to Snipes. A reasonable trier of fact could have concluded that Harold and Lisa—as early as December 3, 2010—"positively or tacitly c[a]me to a mutual understanding" (*Calhoun*, *supra*, 50 Cal.2d at p. 144) to prevent or dissuade Snipes from attending or giving testimony at trial.

Second, the record—viewed in the light most favorable to the verdict—demonstrates overt acts. As noted in a December 3, 2010 call, Lisa agreed to "'get a hold of [Kodie]'" and tell her to contact Snipes. In a December 7, 2010 call, Harold chastised Lisa for sending Kodie to "'the wrong place'" and questioned "'what kind of message

23.

[Lisa] gave [Kodie.]'" Lisa stated that Kodie notified her that day about the failed attempt to contact Snipes but refused to accept blame for the mishap. A reasonable trier of fact could have surmised that Lisa—in furtherance of the conspiracy—relayed Harold's "talk to bonehead" message to Kodie between December 3 and December 7, 2010, though Kodie did not successfully carry out the plan on her part. (See *People v. Von Villas* (1992) 11 Cal.App.4th 175, 201-202, 242, fn. 12, 245 [promise to call potential coconspirator and call itself "look toward the accomplishment of and manifest an intent to commit the crime"].) Furthermore, in light of Kodie's failure, Harold and Lisa considered an arrangement to have Lisa (1) accompany Kodie to Snipes's residence and (2) persuade Snipes to either "'shut tha fuck up'" or, if he "'[got] up on the throne,'" place criminal culpability on someone other than Harold. "If the conspirators partake, among themselves, in arrangements, discussions, and preparation in regard to and for the criminal act, then they have ventured beyond a mere criminal intention .…" (*Id.* at p. 245.)[11]

---

[11]Harold also contends that "there was no independent evidence to show either an agreement or an overt act in furtherance of the conspiracy outside of the recorded telephone calls between [him] and Lisa," violating the corpus delicti rule. "The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) "This rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that *never happened*." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169, italics added.) Hence, the corpus delicti rule does not apply to a perpetrator's extrajudicial statements that are part of the crime itself, as was the case here. (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 345, 393-394, superseded by statute on another ground by *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107 [defendant's statement of intent to attempted rape and murder victim—i.e., "I want to rape you"—was part of crime and did not have to be independently proved]; *People v. Chan* (2005) 128 Cal.App.4th 408, 420-421 [defendant's false written entries on convicted sex offender registration forms constituted crime]; *In re I.M.* (2005) 125 Cal.App.4th 1195, 1203-1204 [defendant's misleading statements to police about shootings were part of conduct of crime of accessory after the fact and not subject to corpus delicti rule].)

***III.*** ***Section 654 did not require the trial court to stay execution of punishment on count 2***

***A.*** ***Standard of review***

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; see *People v. Blake* (1998) 68 Cal.App.4th 509, 512 ["A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence."].)

***B.*** ***Analysis***

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)  Moreover, "because [section 654] is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison*, *supra*, 48 Cal.3d at p. 335.)  "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid.*)  "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation

25.

committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*Ibid.*)

The trial court imposed an aggregate 15-year sentence incorporating a four-year term on count 3, an eight-month term on count 1, an eight-month term on count 2, and an eight-month term on count 5. Harold asserts that he cannot be punished for both possessing methamphetamine for sale (count 1) and opening or maintaining a place for selling methamphetamine (count 2) because these offenses "were committed with the same criminal intent and objective —to sell methamphetamine." In an earlier case, however, we identified and explained the separate objectives underlying these crimes:

> "[A defendant]'s possession of … bags of methamphetamine for the purpose of sale was comparable to a store owner's possession of his or her current inventory. The owner's objective in possessing it is to sell it. The owner's objective in maintaining the store, however, is different from and independent of this intent. He or she intends to provide a place for selling his or her future inventory on an ongoing basis, regardless of whether the current inventory is ever sold or not." (*People v. Moseley*, *supra*, 164 Cal.App.4th at p. 1604.)

Harold does not dispute that substantial evidence supported his conviction on count 1. As already discussed, substantial evidence showed that Harold maintained 1933 West 4th Street as a site to sell methamphetamine on an ongoing basis.

We therefore conclude that section 654 did not require the trial court to stay execution of punishment on count 2.

## *<u>DISPOSITION</u>*

The judgment is affirmed.

 

_____
Smith, J.

WE CONCUR:

_____
Kane, Acting P.J.

_____
Poochigian, J.

27.